## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

NIVEA OTERO VÁZQUEZ, *et al.*,

     Plaintiffs,

     v.                      Civil No. 10-1605 (JAG/BJM)

ORLANDO ORTIZ CHEVRES, *et al.*,

     Defendants.

### REPORT AND RECOMMENDATION

Nivea Otero Vázquez ("Otero") and Janet I. Pedroza Rivera ("Pedroza") are career employees of the Municipality of Naranjito who claim that officers affiliated with the Partido Nuevo Progresista ("PNP") relegated them to "menial tasks and repetitive work" because of their lifelong affiliation with the Partido Popular Democrático ("PPD"). Joined by Pedroza's husband and conjugal partnership, they sued six municipal officers in their individual and official capacities: the Mayor, Orlando Ortiz Chevres ("Ortiz"); the Director of Federal Programs, Charity Rivera Vázquez ("Rivera"); the Director of Finance, Carmen R. Matos Sánchez ("Matos Sánchez"); the Director of the Internal Audit Office, Emmanuel Matos García ("Matos García"); the Director of Purchasing, Carlos Ríos ("Ríos"); and the Director of the Human Resources Office, Marialis Figueroa Negrón ("Figueroa").[1] Plaintiffs seek damages under 42 U.S.C. § 1983 for alleged violations of their rights under the First and Fourteenth Amendments, as well as for violations of Puerto Rico's constitution and statutes. Docket No. 1.

Defendants now move for summary judgment. Docket No. 69. Plaintiffs opposed. Docket No. 84. The motion was referred for a report and recommendation. Docket No. 79. Summary judgment should be **granted** as to all claims.

---

[1] By suing municipal officers "in their official capacities," plaintiffs are suing the Municipality itself. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material only if it "might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and "[a] 'genuine' issue is one that could be resolved in favor of either party." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004).  The court does not weigh facts, but instead ascertains whether the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Leary v. Dalton*, 58 F.3d 748, 751 (1st Cir. 1995).

The movant must first "inform[] the district court of the basis for its motion," and identify the record materials "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); R. 56(c)(1). If this threshold is met, the opponent "must do more than simply show that there is some metaphysical doubt as to the material facts" to avoid summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The nonmoving party may not prevail with mere "conclusory allegations, improbable inferences, and unsupported speculation" for any element of the claim. *Medina-Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).  Still, the court draws inferences and evaluates facts "in the light most favorable to the nonmoving party," *Leary*, 58 F.3d at 751, and the court must not "superimpose [its] own ideas of probability and likelihood (no matter how reasonable those ideas may be) upon the facts of the record." *Greenburg v. P.R. Maritime Shipping Auth.*, 835 F.2d 932, 936 (1st Cir. 1987).

## FACTUAL BACKGROUND

The record is summarized here using the Local Rule 56 statements of uncontested facts filed by defendants (Docket No. 71, "Def. St.") and plaintiffs (Docket No. 84-1, "Pl.

St."). [2]  Defendants did not oppose plaintiffs' statement of additional facts.  *See* Local Rule 56(d).  Therefore, to the extent plaintiffs' statements are supported by the cited evidence, they should be deemed admitted.  *See* Local Rule 56(e).

### Defendants' Background

According to Rivera, between April and November 2008, she did not publicly identify herself as a member of the PNP or any other party; she worked for a non-partisan non-profit organization, and gave policy ideas to both mayoral candidates.  Def. St. § 2, ¶¶ 9–11.  Otero knows Rivera was on the mayor's transition committee, and infers that she was therefore PNP like the mayor.  Def. St. § 1, ¶ 141.  Pedroza had never seen Rivera in any political activities, and before Rivera was appointed by Ortiz, she did not believe Rivera was a PNP supporter.  Def. St. § 2, ¶ 7.  Ortiz, for his part, says Rivera was a PPD member who nonetheless worked for his campaign.  Pl. St., ¶ 29.  One municipal employee, Carmen Rodríguez, disliked Rivera's management style; for instance, she found it peculiar that Rivera held meetings with new hires in a van.  *Id.*, ¶ 4.  Rivera had previously placed Rodríguez in a room with a desk and chair, but no other equipment.  *Id.*, ¶ 1.  Another employee, Marisol Colón, described Rivera's attitude towards both Otero and Pedroza as "always on top of [them] . . . exerting pressure that . . . she did not ease up."  *Id.*, ¶ 17.  She also opined that Rivera treated new PNP-affiliated employees with less condescension than she did the PPD incumbents.  *Id.*, ¶ 18.

Figueroa was a PNP polling station officer during the 2000, 2004, and 2008 elections.  Docket No. 71-6 at 2.  Otero guessed Figueroa's party membership from the fact of her appointment to a trust position.  Def. St. § 1, ¶ 82.  Figueroa's father worked

---

[2] Local Rule 56 requires parties at summary judgment to supply brief, numbered statements of facts, supported by citations to admissible evidence.  It "relieve[s] the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute," *CMI Capital Market Inv. v. González-Toro*, 520 F.3d 58, 62 (1st Cir. 2008), and prevents litigants from "shift[ing] the burden of organizing the evidence presented in a given case to the district court." *Mariani-Colón v. Dep't of Homeland Sec.*, 511 F.3d 216, 219 (1st Cir. 2007).  The rule "permits the district court to treat the moving party's statement of facts as uncontested" when not properly opposed, and litigants ignore it "at their peril."  *Id.*

on Ortiz's campaign, and Figueroa was an electoral college official.  Pl. St., ¶ 31.  During the transition period, Figueroa worked without pay to learn the Human Resources position.  Def. St. § 1, ¶¶ 84–86.

Ríos was a ward president for Ortiz's campaign.  Pl. St., ¶ 30.

Matos García is a PNP partisan.  Pl. St., ¶ 34.  Colón said Matos García would never give work to his female employees.  *Id.*, ¶ 22.

Otero clarified that she is not suing Matos Sánchez or Ríos.  Def. St. § 1, ¶¶ 70–71.  Pedroza clarified that she is not suing Matos García.  Def. St. § 2, ¶ 99.

***Otero's Employment History***

Otero has worked for the Municipality off and on since 1985.  She was hired under a PPD mayoral administration.  Her first post was a contract-basis Inspector of Federal Programs.  She was appointed to a career position in the Finance Department, and later worked as a Property Manager for the Public Works Department before leaving in 1998 to join the United Auto Workers.  She was president of the UAW-affiliated union for municipal employees, and took a one-year leave of absence to work for the union.  She returned to the Municipality for a few months following that leave.  But between 1999 and 2003, she worked for UAW, and gave up her career post with the Municipality.  Def. St. § 1, ¶¶ 1–10.

During December 2003, a PPD administration hired Otero for the position of Administrative Auxiliary in the CRIM office, which she had not previously held.  Otero had problems with the director, and left within a month; thus, she did not complete a three-month probationary period for that position.  Otero had not held any career position since she left the Public Works department in 1998.  Otero then worked at a UAW-affiliated union for public school lunch workers until 2005.  *Id.*, ¶¶ 11–15.

In 2005, as a PPD incumbent mayor began his second term, Otero was appointed to the trust position of Internal Auditor.  In August 2008, she was appointed to a career position as Auditor.  She was not a career employee when she was appointed Internal

Auditor, nor had she ever been a career Auditor or a career Internal Auditor.  This appointment was the highest-paying career post Otero had held with the Municipality up through that date.  Though no longer in a trust position, Otero was the Acting Internal Auditor until February 2009, when Ortiz (the new PNP mayor) appointed defendant Matos García as Internal Auditor.  In both administrations, Internal Auditor was a trust position.  Def. St. § 1, ¶¶ 16–22.  During her transition period with Matos García, Otero never provided him with any information, reports, or other communications.  *Id.*, ¶ 37.

### Knowledge of Otero's Political Affiliation; Political Comments

Otero was not a PPD coordinator during the 2008 elections.  Def. St. § 1, ¶ 97.  Otero never talks politics in the workplace.  *Id.*, ¶ 90.  Otero kept a diary of events taking place at work.  She started the diary because she knew the new administration was PNP, and she expected to be persecuted because of her PPD activism.  *Id.*, ¶¶ 58–59.

Ortiz testified that he was aware Otero had held a trust position under a PPD mayor, and therefore assumed she was PPD too.  Pl. St., ¶¶ 32–33.  Nonetheless, Ortiz claimed in written statements that before becoming mayor, he did not know Otero or what her political affiliation was, and that he had not seen her in any political activities.  Def. St. § 1, ¶¶ 98, 103, 105, 106.  While in office, Ortiz never asked or made efforts to learn Otero's political affiliation, and denies having ever been motivated by her political affiliation.  *Id.*, ¶¶ 108–111.[3]  The two had not discussed politics.  *Id.*, ¶ 107.  Otero recalls that Ortiz and his family voted at her polling place in the 2000 and 2004 elections.  Docket No. 71-1 at 48.  Otero speculates that Ortiz could have seen her blocking traffic for campaign caravans in prior election cycles.  *Id.* at 49.  Ortiz also knows Otero's mother because Otero's mother was a longtime teacher.  Def. St. § 1, ¶ 104.

---

[3] Plaintiffs say that these statements, and others like it, are inadmissible because they are "self-serving."  But that label goes to the weight of the evidence, and "[i]t is simply not enough to say, in effect, that the testimony of a [defense witness] might be disbelieved by a jury. Instead, [plaintiff] must offer specific facts to counter those set out by [the defendant]. . . . This is the case even where motive and intent are at issue."  *See Arroyo-Audifred v. Verizon Wireless, Inc.*, 526 F.3d 215, 219 (1st Cir. 2008) (citations omitted).

Matos García had never met Otero before he began working at the Municipality. Def. St. § 1, ¶ 65.  Otero does not recall ever hearing Matos García disparage the PPD by name.  *Id.*, ¶ 62.  However, once in December 2010 while at the office, Matos García commented to one of Otero's neighbors that the Municipality would soon fix a particular road "because they never fixed it," even though the PPD administration had in fact fixed that road before.  Docket No. 71-3 at 5–7.  Matos García was not an activist in the 2008 election cycle.  Def. St. § 1, ¶ 63.  He has lived in Corozal for over 28 years, and has not lived in Naranjito.  *Id.*, ¶ 64.

Figueroa and Otero never discussed each other's affiliation or party.  Def. St. § 1, ¶¶ 87–89.  Figueroa was not part of the mayor's campaign staff.  *Id.*, ¶ 83.  Figueroa has never seen Otero at PPD political events.  *Id.*, ¶¶ 91–92.  Figueroa has never taken any measures to learn Otero's affiliation.  *Id.*, ¶ 93.  Figueroa denies knowing who Otero was, or what party she was affiliated with, until after she became a municipal officer in 2009. *Id.*, ¶¶ 76–78.  Figueroa does not supervise Otero, and does not interact with her outside the workplace.  *Id.*, ¶¶ 79–80.  Figueroa asserts that she has never acted against Otero because of her PPD affiliation.  *Id.*, ¶¶ 75, 94–95.

Rivera and Otero had never discussed each other's political beliefs or affiliation. Def. St. § 1, ¶¶ 139, 140.  Rivera and Otero never knew each other personally before working for the Municipality.  However, Otero used to work with Rivera's mother, and Rivera's mother and Otero's mother were friends.  *Id.*, ¶ 112.  In addition, Rivera's father was Otero's teacher, and Otero remembers meeting Rivera once when she was a child. *Id.*, ¶ 138.

### Otero's Office Space

Otero had a private office before she was replaced by Matos García.  Def. St. § 1, ¶ 24.  Her secretary (who, at the time, was the only other department employee) did not work inside that private office.  *Id.*, ¶¶ 25, 35.  The office was designated for use by the head of the Internal Audit office.  *Id.*, ¶ 32.  But following Matos García's January 2009

appointment, they shared the office.  *Id.*, ¶¶ 33, 38.  On February 17, 2009, Matos García told Otero he needed the office to himself because he was now Director of the Internal Audit, and needed the privacy and security of the office.  Def. St. § 1, ¶¶ 26, 34, 39.  By the third day after Matos García's request, Otero had not moved.  *Id.*, ¶¶ 27, 40; Docket No. 71-1 at 35.  One day, when Otero had told Matos García she would be late to work, he got help from other municipal employees and moved her desk and the documents on it before she arrived.  Def. St. § 1, ¶ 28.  Matos García was in charge of the Municipality's property and equipment.  *Id.*, ¶ 30.  He placed the desk against the wall at first; upon Otero's arrival, however, she asked him to instead place it parallel to the secretary's..  *Id.*, ¶ 29.  Otero's computer and other things that were on the desk were left on the floor.  Docket No. 71-1 at 35.  However, Matos García did not move the personal belongings Otero kept on a shelf within the private office.  Def. St. § 1, ¶ 31.

Otero, for her part, believed that since she had "practically the same" responsibilities as Matos García and dealt with confidential documents, moving her to a desk in a public area was not appropriate.  Docket No. 71-1 at 31.  She remembered Matos García promising a private cubicle, which she has not been given to this day.  Docket No. 71-1 at 32.  She also recalled Matos García saying he would let her know when the desk was being moved.  Docket No. 71-1 at 37. However, Otero never asked Matos García for her own private space, either orally or in writing.  Def. St. § 1, ¶ 36.

### Otero's Duties and Access to Documents

Otero identified several types of tasks she had performed in the three-year period spanning the time from when Matos García became Internal Auditor to the date of her deposition.   Those tasks included audits of the municipal police, the housing rehabilitation department, the emergency management office, the patron saint festival, disbursements, the property office, the human resources department, the purchasing department, the citizen's office department, the federal programs office, and the sports and recreation department.   She also testified about her work creating risk reports,

developing a strategic plan, developing an internal controls questionnaire, creating written reports of her audits, drafting correspondence, developing property management rules and procedures, and evaluating Comptroller's Office criteria for municipalities. Def. St. § 1, ¶¶ 66, 132. Otero has never been stripped of her title, her salary has never been reduced, and her fringe benefits have never been altered. *Id.*, ¶ 67.[4]

In general, when the Internal Audit office requests documents from another municipal office in the course of an audit, the director of the target office has some degree of discretion in choosing the manner by which those documents are made available. Def. St. § 1, ¶¶ 48, 50. If documents are not produced, the auditor might then visit the target office directly. *Id.*, ¶ 49. One day, Otero tried to retrieve audit-related files from the Municipal Clerk, but the clerk told her Matos García had ordered that only he could pick up the confidential files. Def. St. § 1, ¶ 42. Matos García recalls this being true of at least some documents, but he did not tell Otero she could not retrieve confidential documents. *Id.*, ¶ 44. For her part, Otero could not recall Matos García himself ever writing or telling her about this policy. *Id.*, ¶¶ 43, 47. Otero believes that the head of an office has discretion in deciding what procedures to use. *Id.*, ¶ 50. In any case, Matos García sometimes sent Brenda Rodríguez, the office secretary, to pick up documents. Other times, he sent Otero to pick them up. *Id.*, ¶¶ 45, 52, 53.[5] Like Otero, Brenda Rodríguez was affiliated with the PPD. *Id.*, ¶ 55. It was Matos García's new policy to have only the office secretary pick up documents. *Id.*, ¶¶ 46, 51, 54.

---

[4] Defendants narrate an occasion on which Otero was absent for three days, purportedly without providing the proper leave documentation. *See* Def. St. § 1, ¶ 68. However, the cited deposition pages appear to have been mixed up with those of another witness, and there is therefore no citation to record evidence of this incident. *See* Docket No. 71-2 at 19–20. Plaintiffs deny this statement. *See* Docket No. 84-1 at 16. Since defendants did not file these pages in the record, there is no evidence supporting this statement of fact.

[5] Plaintiffs deny this, asserting that "Otero was not given any documents to complete her duties . . . ." Docket No. 84-1 at 11. But the testimony plaintiffs cite was only about one occasion on which she was forbidden to pick up documents. That account does not conflict with Matos García's testimony about "sometimes" sending her to get documents.

### Otero's Freedom to Move About the Building

Matos García implemented a sign-in/sign-out sheet for municipal employees at the mayor's request, tracking their departure and arrival times and destinations.  Def. St. § 1, ¶¶ 126, 127.   Rivera once told another employee, Ildeana Sánchez, that she did not want people from other offices, specifically mentioning Otero, to visit the Federal Programs office.  *Id.*, ¶ 113.  Otero only learned about this comment because Sánchez told her what Rivera had said.  *Id.*, ¶ 114.   Another time, Rivera told Otero she could not go through the Federal Programs work area to use the water fountain, even though for a time that was the only water fountain in the office.  Pl. St., ¶ 14.

The Federal Programs work area includes the building's employee kitchen. Docket No. 71-1 at 58.  Thus, during her lunch time, Otero would often be in the Federal Programs area.  Def. St. § 1, ¶ 121.  While employees' specific lunch hours varied, most municipal employees took lunch around noon.  *Id.*, ¶ 122.  Otero was not sure whether all Federal Programs employees had the same lunch hour as her.  Def. St. § 1, ¶ 123.

On November 6, 2009, Otero went to the Federal Programs area during working hours and visited one of her friends, Aracelis Fuentes.  Rivera then reprimanded Ildeana Sánchez for this.  Otero was never reprimanded.  Otero learned about this because Sánchez later texted her about it, and because other coworkers mentioned it.  Def. St. § 1, ¶¶ 134–37.

One day, during her lunch time and not as part of any official duty, Otero asked Fuentes to give her a plastic cup.  Def. St. § 1, ¶¶ 124–25.  It is not clear whether this is the same incident as the November 6, 2009 visit.

### The Microwave Incident

One day, Otero brought a microwave oven to the kitchen, replacing one that had been stolen.  Rivera then issued a memo telling employees that Rivera had to authorize any appliances in the kitchen area.  Def. St. § 1, ¶ 129.  Otero understood that she had permission to collect money to buy a new microwave for the office.  *Id.*, ¶ 130.  Otero's

deposition reveals that she is not an expert in small appliance safety or electricity, and had no way of knowing whether this microwave would be dangerous to other employees.[6]  *Id.*, ¶ 131.  Rivera is not Otero's direct supervisor.  *Id.*, ¶ 128.

### *Otero's Complaints*

Otero had some sort of dispute with Matos García, though neither side precisely explains what that dispute was.  In any event, Otero wrote letters about it.[7]  Although Otero copied Figueroa on her letters to Matos García, Figueroa never acted in response.  Def. St. § 1, ¶ 72.  Office directors did not always consult Figueroa for every grievance or disciplinary decision, and did not always check with her regarding attendance or similar everyday issues.  *Id.*, ¶¶ 100–101.  But Figueroa believed that Matos García had resolved any issues with Otero, and that the situation therefore did not require Figueroa's intervention.  Docket No. 71-6 at 11; *see* Def. St. § 1, ¶ 120.  Figueroa generally expected employees with complaints about their supervisors to complain directly to those supervisors.  In cases where employees brought complaints to her, Figueroa would sometimes meet with the supervisor first.  Def. St. § 1, ¶¶ 115–16.  Figueroa expects employees to resolve doubts about their performance reviews with their immediate supervisors.  *Id.*, ¶ 117.  Figueroa would, however, schedule a meeting as soon as possible if both the supervisor and employee asked for one.  *Id.*, ¶ 118.  On the other hand, if a supervisor informs Figueroa that a particular matter has been resolved, she does not investigate further.  *Id.*, ¶ 119.

---

[6] Citing Otero's testimony about her various duties as an auditor, including the development of "internal controls" and "property management" rules, defendants assert that Otero knowingly disregarded some procedure or regulation by putting a microwave oven in the kitchen.  Def. St. § 1, ¶ 133.  But defendants failed to introduce evidence of what procedure or regulation, if any, might have been violated, or even that any decisionmaker perceived a violation.  Thus, the record does not compel a conclusion that Otero knowingly violated procedures on this occasion.

[7] The complaint alleges that Otero wrote letters about "her working conditions and the lack of assignment of duties, and the lack of tools to perform the limited duties assigned."  Docket No. 1, ¶¶ 29–30.  Neither side has clarified whether this is the "correspondence" that witnesses were deposed about.

Although Otero sent Ortiz copies of the complaint letters that she addressed to Matos García, Ortiz never acted in response to them.  Def. St. § 1, ¶ 76.  This failure to act was the only way Otero felt discriminated against by Ortiz.  *Id.*, ¶ 102.  Ortiz never asked any of his directors to identify employees who needed to be fired.  *Id.*, ¶ 60.

### Pedroza's Employment History

At the time Ortiz became mayor in January 2009, Pedroza worked in the Federal Programs office as an Accounting Officer.  Def. St. § 2, ¶ 5.  This was a "career" position.  *Id.*, ¶ 12.  Pedroza was appointed to a career accounting post by a PPD mayor.  *Id.*, ¶ 13.  The position of Accounting Officer is not permanently associated with any department of the Municipality, and is funded by the budget for the mayor's office.  *Id.*, ¶ 14.  Thus, an Accounting Officer may be assigned to different departments according to need.  *Id.*, ¶ 15.  At some point in the past, Pedroza had worked in the Finance Department, but later was moved to Federal Programs.  *Id.*, ¶ 16.

### Knowledge of Pedroza's Political Affiliation

With the exception of the 2008 election cycle, Pedroza considered herself a PPD "activist."  She did not participate in the 2008 elections because her sister was suffering a terminal form of cancer.  Def. St. § 2, ¶¶ 2–4.  At some point in the past, Pedroza had been a PPD electoral commissioner in Naranjito.  Docket No. 82-1 at 127–32.[8]

Rivera is the daughter of the director of the school Pedroza's son attends, so Pedroza has seen Rivera there.  Def. St. § 2, ¶ 8.

Ortiz claims he did not know Pedroza's political affiliation, has never seen her in a political activity, never discussed politics with Pedroza, never tried to learn her affiliation, and claims never to have acted on the basis of her affiliation.  Def. St. § 2, ¶¶ 75–81.

---

[8] This particular detail is not cited by either party, but crops up in a line of deposition testimony cited by defendants.  *See* Def. St., ¶ 4; Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

Figueroa did not know Pedroza before she worked for the Municipality, did not interact with her outside the workplace, did not know her political affiliation, has never seen her in a political activity, has never discussed politics with her, has never tried to learn her political affiliation, and claims never to have acted on the basis of her affiliation. Def. St. § 2, ¶¶ 82–89.

Matos Sánchez has not known or attempted to learn Pedroza's political affiliation, and claims never to have based any decisions on it. Def. St. § 2, ¶¶ 55, 96–98.

Ríos did not know Pedroza's affiliation, has not attempted to learn it, and has never based any actions on it or made any decisions about her employment. Def. St. § 2, ¶¶ 91–94.

### Pedroza's First Interactions with Rivera

When Rivera began her transition preparations, she requested certain information from the office's coordinators. Def. St. § 2, ¶ 60. She met with the coordinators and explained her plan to restructure the department and establish procedures. *Id.*, ¶ 61. Pedroza—a non-coordinator—suddenly entered this meeting and asked Rivera why she wasn't meeting with the entire staff. *Id.*, ¶¶ 62–63. Later, when meeting with the administrative staff, Rivera asked them to explain their duties, and some of the staff responded that they had none. *Id.*, ¶ 65. Rivera got the impression that Pedroza and a few other employees had a negative attitude. *Id.*, ¶ 66–67. In discussing work schedules with Rivera, Pedroza noted that she had a "flex time" and child-care accommodation, allowing her to go pick up her daughter and keep her at the office for about half an hour until the child's father could come get her. Rivera felt that Pedroza said this with a negative attitude, and responded that she did not agree but that she would have to check with Human Resources. *Id.*, ¶ 68. Pedroza's "flex time" was not taken away. *Id.*, ¶ 69.

They also discussed changes to a previously-approved vacation plan, which was within Rivera's discretion. Def. St. § 2, ¶¶ 70–71. Pedroza's previously-approved

vacations for 2009 were not altered, and Pedroza did not consider Rivera's review of vacations to be politically motivated.  *Id.*, ¶¶ 72–73.

One day (when, precisely, is unclear), Colón saw Rivera yell at Pedroza in the parking lot.  Colón could not hear what was being said.  Pl. St., ¶ 21.

### Pedroza's Cancelled Transfer to Purchasing

At one point, Ortiz decided to transfer Pedroza from Federal Programs to Purchasing.  Figueroa told Pedroza that she would provide Pedroza with an explanation of her duties, but that Pedroza could also talk to Ríos and discuss the duties in Purchasing.  Def. St. § 2, ¶ 30.  Figueroa asked Pedroza about the type of computer and desk she had so that similar equipment could be provided after her transfer.  *Id.*, ¶ 34.  Pedroza's new duties would have included inventory control, cost accounting, analysis of purchasing-related accounts, expenses by dependency, and cost reduction analysis.  *Id.*, ¶ 31.

According to Pedroza, Rivera said that she requested Pedroza's transfer out of Federal Programs because Pedroza's coworkers had complained about her, and not for any "personal" reasons.  Def. St. § 2, ¶ 17.  But according to Rivera, Pedroza's transfer was motivated by a need from the Purchasing department (expressed by Ríos) for someone with accounting experience.  *Id.*, ¶¶ 32–33.  Yet according to Marisol Colón, another employee, there was no need for an accountant in Purchasing.  Pl. St., ¶ 23–24.  Rivera never saw the letter to Pedroza informing her of the transfer.  Def. St. § 2, ¶ 18.

One or two days before Pedroza's transfer was supposed to become effective, Rivera told her the transfer was being cancelled because Pedroza was behind on work for the Federal Programs office, though Pedroza denies that she was behind on anything.  Def. St. § 2, ¶ 19.  Pedroza said Rivera never told her what specific work she was behind on.  *Id.*, ¶ 24.  Rivera had told Figueroa that Pedroza was behind in accounting work, and that later audits had revealed some mistakes in Pedroza's work.  *Id.*, ¶¶ 44–47.

On the date Pedroza expected her transfer to be effective, she reported to the Purchasing Department instead of Federal Programs, since she believed she had to be notified in writing of any change to her transfer order. Def. St. § 2, ¶ 25. Figueroa, however, did not believe any written notification was required to cancel her transfer, and that oral notification alone was enough. *Id.*, ¶ 36. She continued reporting to Purchasing for about a week, but was told that a desk was not ready for her there. *Id.*, ¶ 27. Pedroza was unable to discuss this situation with Ríos because he was out of the office at the time. *Id.*, ¶ 28. And since she never stopped working in Federal Programs, Ríos never directly supervised Pedroza's work. *Id.*, ¶ 29.

Pedroza, Rivera, and Figueroa had a meeting in which Pedroza demanded a written confirmation that her transfer was cancelled, and Figueroa refused to give it to her. Figueroa countered that Pedroza had to give Rivera a table listing the federal projects she had been responsible for, so that Rivera could supervise Pedroza's progress. Def. St. § 2, ¶¶ 43–44. Another employee, Carmen Rodríguez, was present at this meeting. Pl. St., ¶ 2. Rodríguez was concerned that if Pedroza was reassigned, it would leave her with nobody to work on a particular budget. *Id.*, ¶ 3. Pedroza refused to sign an acknowledgment that the transfer was cancelled, because the acknowledgment also recited that the reason for cancelling her transfer was that Pedroza was behind on work for Federal Programs. Def. St. § 2, ¶ 37. Pedroza commented that she did not believe the transfer was cancelled because of her politics, but because of an intent that she be kept in the department until the close of a fiscal year. *Id.*, ¶ 38.

### Pedroza's Performance in the Federal Programs Department

Pedroza's duties while in the Federal Programs department included developing budget proposals. Def. St. § 2, ¶ 23. The weekend following her notice of transfer, Pedroza worked from home on a budgeting proposal for a program called "Comadres," for which an approval deadline was looming. Pedroza says she had not been told of this

deadline.  *Id.*, ¶ 20.  Pedroza had some past years' work and forms regarding the program on her computer, but there were other documents that she did not have.  *Id.*, ¶¶ 21, 22.

At some point, Rivera told Pedroza that she only had to "update the books"; Pedroza's other tasks were given to two other employees.  Def. St. § 2, ¶¶ 26, 42.  Rivera never wrote anything memorializing a reduction in Pedroza's duties.  *Id.*, ¶ 39.  Pedroza nonetheless took on a few additional tasks, and when she would tell Rivera about those tasks, Rivera would respond that she should go ahead.  *Id.*, ¶ 40.  In particular, Pedroza oversaw the fiscal-year closing for the federal programs she had handled prior to Rivera's appointment.  *Id.*, ¶ 41.

In November 2009, shortly before Pedroza was about to start a scheduled vacation, Rivera confronted her about monitoring reports for a program called "CADEN."  Def. St. § 2, ¶ 49.  Rivera wanted Pedroza to complete those reports, but Pedroza refused because she had not worked on that program's books since June, and did not want to take responsibility for errors made by the person previously assigned to that program.  *Id.*, ¶ 48.  The monitoring inquiry ran on an October 1–September 30 fiscal year, and thus included transactions occurring prior to the new administration's January installation.  *Id.*, ¶ 50.  Pedroza requested and received permission to miss an otherwise-mandatory "field day" to work on the report.  *Id.*, ¶ 74.

Marisol Colón testified Pedroza once met with Ortiz, Rivera, Matos García, and Matos Sánchez.  Colón did not attend that meeting, but remembers hearing raised voices. Pedroza later told Colón she was verbally attacked in that meeting, and Colón thought Pedroza seemed more nervous than before she went in.  Pl. St., ¶ 19.

Rivera gave Pedroza the duty to train new staff.  Def. St. § 2, ¶ 51.  Pedroza has also, at several points, represented the Municipality in presentations to agencies that provide program funding.  *Id.*, ¶ 52.

### *Pedroza's Transfer to the Finance Department*

In December 2009, both Ortiz and Matos Sánchez told Pedroza she was being transferred to the Finance department.  Def. St. § 2, ¶¶ 53, 54.  According to Matos Sánchez, the outside monitor—Rivera's friend and former roommate—had complained about Pedroza's work, and Matos Sánchez's office was short-staffed.  *Id.*, ¶ 53.  However, two other employees testified that there was no work for Pedroza in the Finance office because all tasks were already divided among the employees.  Pl. St., ¶¶ 13, 26–28.  Carmen Rodríguez, a third municipal employee, was not aware of any reason for transferring Pedroza to Finance, but speculated that the new PNP trust-position officers would have a motive to "do everything they can against us [PPD-affiliated employees.]"  *Id.*, ¶¶ 5–6.  Additional PNP-affiliated accounting employees were hired after Pedroza was reassigned.  *Id.*, ¶¶ 7–8, 20.  López testified that those new employees were not effective.  *Id.*, ¶ 10.  In any event, Pedroza went along with the transfer.  Def. St. § 2, ¶ 54.

Figueroa was out on maternity leave when this transfer occurred, and a different person was acting as human resources director in her stead.  Def. St. § 2, ¶ 56–57.  Pedroza's new duties were to support Matos Sánchez's accounting work, cover coworkers' vacations, perform accounting for vouchers and payments, cover coworkers' excess work, work with the payroll registry, manage the software for municipal revenues, perform quality control on data entry for that software, and reconcile receipts.  *Id.*, ¶ 58.  Pedroza would seek Matos Sánchez's approval to undertake tasks in the department.  *Id.*, ¶ 59.  Matos Sánchez would sometimes limit the tasks or information Pedroza was responsible for.  Pl. St., ¶ 11.  Ortiz closely supervised Matos Sánchez and the Finance department.  *Id.*, ¶ 12.

### DISCUSSION

Plaintiffs argue that defendants punished them for being PPD partisans, violating their rights to free association under the First Amendment, to equal protection under the

Fourteenth Amendment, and making them liable under Puerto Rico law.[9]  Defendants argue that (1) Pedroza's husband and conjugal partnership lack standing to sue, (2) plaintiffs do not have any separate Equal Protection Clause action, (3) the evidence does not establish any First Amendment violations, (4) the individual defendants are entitled to qualified immunity, and (5) the court should decline supplemental jurisdiction absent viable federal claims.

## I.      Spousal Standing

Defendants correctly argue that Pedroza's husband and conjugal partnership have no standing to sue under section 1983.  Def. Mem. at 32–34.  Section 1983 does not provide a cause of action for family members' damages "unless the unconstitutional conduct was aimed at the familial relationship."  *See Robles-Vasquez v. Tirado García*, 110 F.3d 204, 206 n. 4 (1st Cir. 1997) (wrongful death); *Ramírez-Lluveras v. Pagán-Cruz*, 833 F. Supp. 2d 151, 157–58 (D.P.R. 2011) (collecting cases).  Nonetheless, under supplemental jurisdiction principles, they may bring local-law claims that share a common nucleus of fact with a claim conferring federal jurisdiction.  *See Rodríguez-Rios v. Cordero*, 138 F.3d 22, 26–27 (1st Cir. 1998).  To the extent Pedroza's husband and conjugal partnership intend to maintain section 1983 claims, defendants should be granted summary judgment.  I later address whether the court should entertain any spousal claims under Puerto Rico law.

## II.     Equal Protection

Defendants argue that plaintiffs' equal protection theory fails to allege discrimination that triggers any heightened degree of scrutiny.  "An equal protection claim alleging political discrimination merely restates a First Amendment political discrimination claim and, as we have said repeatedly, should [be] considered under the

---

[9] Plaintiffs' memorandum also devotes a section to a due process "pre-transfer hearing" theory.  However, the court dismissed all due process claims with prejudice at the pleading stage. *See* Docket No. 26.

First Amendment." *Uphoff Figueroa v. Alejandro*, 597 F.3d 423, 430 n.8 (1st Cir. 2010) (citing *Morales-Santiago v. Hernández-Pérez*, 488 F.3d 465, 471 (1st Cir. 2007)); *Ruiz-Casillas v. Camacho-Morales*, 415 F.3d 127, 134 (1st Cir. 2005). Plaintiffs' equal protection claims fit this mold; in a single federal cause of action, they allege that defendants "have willfully and/or with deliberate indifference violated the Plaintiff[s'] rights under the First and Fourteenth Amendments (freedom of speech/association and equal protection) of the United States Constitution," and that plaintiffs "have been discriminatorily treated because of [their] political affiliation . . . ." Docket No. 1, ¶¶ 56–57.

Plaintiffs counter that in *Guillemard-Ginorio v. Contreras-Gomez*, 585 F.3d 508, 532–34 (1st Cir. 2009), the Court of Appeals found no error in giving parallel First Amendment and Equal Protection Clause jury instructions. The jury in that case found:

> . . . that Contreras treated the plaintiffs differently from others similarly situated, and that such selective treatment was based on, and the same actions would not have been taken but for, the political affiliation and activities of Guillemard. It also found that both Contreras and Juarbe intentionally treated plaintiffs differently than others similarly situated, without a rational basis for the difference in treatment.

*See id.* at 529. Importantly, the *Guillemard-Ginorio* plaintiffs proved that their party affiliation was the but-for cause of a redressable injury. Therefore, there was no material difference between the First Amendment and Equal Protection Clause doctrines relevant in that case. Here, the complaint provides no hint that plaintiffs are litigating any equal protection theory *other* than political discrimination, such as malicious singling-out. *Cf. Tapalian v. Tusino*, 377 F.3d 1 (1st Cir. 2003); *see also Fleming v. Lind-Waldock & Co.*, 922 F.2d 20, 24 (1st Cir. 1990) ("Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings."). While instructing the jury on separate claims might not be erroneous, there nonetheless is no basis for independently analyzing an indistinguishable Equal Protection Clause theory. Because plaintiffs did not plead any equal protection theory other than political discrimination, I proceed to

evaluate political discrimination under First Amendment doctrine alone. *See Uphoff-Figueroa*, 597 F.3d at 430 n.8. Summary judgment on the equal protection claims should be granted.

### III.   Political Discrimination in Public Employment

Before considering each plaintiff's claim against each defendant, I review the legal framework for claims of political discrimination. The First Amendment protects non-policymaking employees from partisan adverse action by government employers. *Martínez-Vélez v. Rey-Hernández*, 506 F.3d 32, 39 (1st Cir. 2007) (citing *Elrod v. Burns*, 427 U.S. 347 (1976)). A claim of political-affiliation discrimination has four substantive elements: (1) that the plaintiff and defendant had opposing affiliations; (2) that the defendant knew the plaintiff's affiliation; (3) that a materially adverse action took place, and (4) that political affiliation was a substantial or motivating factor in that action. *Peguero-Moronta v. Santiago*, 464 F.3d 29, 48 (1st Cir. 2006). An employment action must be so negative that it would "place substantial pressure on even one of thick skin to conform to the prevailing political view," and thus "result in a work situation unreasonably inferior to the norm for the position." *Agosto-de-Feliciano v. Aponte-Roque*, 889 F.2d 1209, 1218 (1st Cir. 1989) (en banc), *abrogated on other grounds by Maldonado v. Fontanes*, 568 F.3d 263 (1st Cir.2009). And at summary judgment, the evidence of a defendant's knowledge of (and reliance on) a plaintiff's political affiliation must be rooted in specific facts, not "speculative, general allegations." *See González-de-Blasini*, 377 F.3d at 86 (citation and quotation marks omitted).

To be liable under 42 U.S.C. § 1983, each individual state-actor defendant must have personally participated in, encouraged, condoned, or acquiesced in rights-violating conduct. *Ayala-Rodríguez v. Rullán*, 511 F.3d 232, 236 (1st Cir. 2007); *Martínez-Vélez*, 506 F.3d at 41 n.5. A municipality is only liable for conduct that amounts to an official policy or custom, or for the conduct of a person with "final policymaking authority." *Welch v. Ciampa*, 542 F.3d 927, 941–42 (1st Cir. 2008) (citing *Monell*, 436 U.S. at 694,

*Owen v. City of Independence*, 445 U.S. 622 (1980), and *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123–24 (1988) (O'Connor, J., for plurality)).   Puerto Rico mayors, for instance, have final policymaking authority over municipal employment decisions. *Velázquez Rodríguez v. Mun'y of San Juan*, 659 F.3d 168, 181 (1st Cir. 2011).

It is an affirmative defense for a defendant to prove that the same adverse action would have occurred regardless of the plaintiff's politics.  *Rodríguez-Ríos*, 138 F.3d at 24 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).   A defendant seeking summary judgment on this basis must offer evidence that "*compel[s]* the finding that political discrimination did not constitute a 'but for' cause" for the challenged action.   *Jirau-Bernal v. Agrait*, 37 F.3d 1, 4 (1st Cir. 1994) (emphasis in original).

### A.     Otero's Claims

#### 1.     Knowledge of Opposing Political Affiliation

Ortiz testified that he believed Otero was a PPD partisan because he had been president of the Municipality's PNP since 2000, and that PNP municipal legislators kept him informed of all PPD trust appointments.  Docket No. 84-3 at 4.  While defendants focus on his narrower statement that he did not "know" her affiliation, the deposition testimony allows an inference that Ortiz was aware of Otero's PPD affiliation even without personally observing her engagement.

As for Matos García, a jury could rationally infer that the incoming head of an office under a newly-elected PNP mayor would know that his immediate predecessor had been appointed by a PPD mayor.  Of course, the lone fact of a plaintiff's past trust-position appointment might not be enough to support a finding of knowledge.  *See Guzman-Ruiz v. Hernandez-Colon*, 406 F.3d 31, 34 (1st Cir. 2005) (canvassing cases). But in light of the internal audit office's sensitive work, it takes a much smaller leap to infer that a new director will know his immediate predecessor's affiliation.  *Cf. Vázquez-Valentin v. Santiago-Díaz*, 385 F.3d 23, 38 (1st Cir. 2004), *vacated on other grounds*, 546

U.S. 1163 (2006) (rejecting claim where there was "no evidence that [plaintiff's] trust position was of such a high nature that defendants necessarily would have known who she was and her party affiliation.").

The same could probably be said for Figueroa and Rivera, though the case is weaker since Otero was not working closely under either of them.  For the sake of argument, I go on to consider the next element of Otero's claims against them.

### 2.       *Materially Adverse Action*

As to Matos García, a jury crediting Otero could conclude that he caused two materially adverse actions.  First, the jury may find that her work area lacks the privacy necessary for a career-post auditor, since she handles internally-sensitive information in many of the same ways as Matos García does.  *See* Docket No. 71-1 at 31–32.  Indeed, Matos García cited professional privacy as a reason for moving her out of his office in the first place; a common-sense inference could be that auditors need to have a private work space.  *See* Def. St. § 1, ¶¶ 26, 34, 39.  Second, Matos García's directives to the Municipal Clerk permit the conclusion that he kept Otero from retrieving documents she needed to complete her assigned duties.  Def. St. § 1, ¶¶ 42–44, 47.

Less persuasively, Otero also contends that she "was required to sign an entrance and exit sheet every time she left the office," and that this "was not required of the PNP employees."  Docket No. 84 at 9.  But no cited evidence even suggests that any PNP employees were excused from the sign-out procedure.  Indeed, within the Internal Audit office, there is no evidence of there being *any* PNP employees (other than Matos García himself, anyway) who could have been excused from that procedure.  Absent evidence of any disparate application, an evenhanded rule tracking employees' whereabouts cannot be found materially adverse.  Plaintiff also asserts, in passing, that her computer password was changed.  Docket No. 84 at 9.  Nothing in the complaint or either side's statement of fact mentions passwords at all, so this contention merits no further consideration.

As for the failures to answer Otero's complaint letters to Ortiz, Figueroa, and Matos García, plaintiffs have not put on enough evidence to establish that these omissions amounted to a materially adverse action.  *See Redondo Waste Systems, Inc. v. Lopez-Freytes*, 659 F.3d 136, 141 (1st Cir. 2011) (noting, in case alleging First Amendment, due process, and equal protection theories, that defendants' "failure to answer a letter is hardly the stuff of constitutional violations.").  Indeed, plaintiffs do not point to any evidence in the record even indicating *what* Ortiz wrote about and requested, let alone *how* ignoring that correspondence exerted pressure on her.  A rational jury could not find that this conduct meets the standard for adversity.

Otero's evidence of Rivera's conduct is likewise insufficient to show material adversity.  Her complaints are essentially that Rivera mentioned her (to someone else) as a person visiting the Federal Programs area too often, that Rivera scolded another employee following one such visit, and that Rivera wrote a memorandum complaining about the microwave Otero brought to the kitchen, notwithstanding Otero's belief that she had permission to collect money and buy one.  In political discrimination cases, courts must separate "'the wheat' of real impairments from 'the chaff of minor irritants and frustrations' in any workplace." *Martinez-Velez*, 506 F.3d at 42.  These fleeting spars with the lunchroom-overseeing head of a different department do not rise to the standard of actionable adversity.

Plaintiffs' rejoinder is hard to decipher.  They say that "the decision as to what duties to perform was that of Charity Rivera and Emmanuel Matos [García], they were directly involved, they had the nuance from the Mayor Ortiz Chevres and the Human Resources Director Marialis Figueroa."  Docket No. 84 at 17 (*sic* throughout).  It is unclear what this sentence (particularly the phrase "had the nuance") means, but in any case there is no evidence of Ortiz or Figueroa's personal involvement in any of Matos García's decisions.

At this juncture, the record does not contain evidence from which Otero could prove an essential element of her claims against Ortiz, Figueroa, or Rivera.  And since Otero has offered neither evidence nor argument showing that Matos García had the relevant final policymaking authority within the Municipality, she has failed to show that the Municipality itself can be liable.  *See* Pl. Mem. at 22–23 (merely stating principle that mayors have final authority over employment).  The Municipality, Ortiz, Figueroa, and Rivera are entitled to summary judgment on Otero's claims; only her claim against Matos García in his personal capacity requires further discussion.

### 3. *Causation*

Otero must further prove that her PPD affiliation was the cause of Matos García's adverse actions.  Plaintiffs note that circumstantial evidence of political animus can satisfy the causation element.  *See* Pl. Mem. at 14–17.  But other than citing the general principle that they need not provide "smoking gun" evidence to survive summary judgment, *see id.* at 15 (emphasis omitted), they do little else to identify *what* circumstantial evidence tends to show causation.  Their discussion merely rattles off some doctrinal buzzwords and empty rhetoric, with no mention of the particular allegations (to say nothing of record evidence) supporting causation:

> Any fact finder can reasonably infer from the factual evidence and the actual testimony of defendants that the political affiliation of the plaintiffs was known and known by Ortiz Chevres specifically. The assertion and attempt to contradict solely confirms what the plaintiff already understands, which is that genuine issues of material fact exist to defeat the motion presented by the defendant. To deny their political animus is to be expected however, sufficient evidence exists to cast a clear light that indeed there was animus or at least that is a matter for the Jury to decide. Knowledge of political affiliation is not solely personal knowledge but discern from the circumstantial evidence even Ortiz Chevres admits that it is assumed. Here the circumstantial evidence points to an office that political affiliation was known in a Municipality that is highly politicized.

Pl. Mem. at 16 (*sic* throughout).  In short, plaintiffs have offered no explanation whatsoever of Otero's causation theory.  Without making even this effort, plaintiffs are

not entitled to have the court sift through the record and build a case for them. *Cf. Velázquez Rodríguez*, 659 F.3d at 176 (in which plaintiff offers "a smattering of cases on the [relevant] topic and contends that the evidence shows a series of discriminatory acts, but he does not clearly specify what this series was. . . .  The upshot is that these claims are waived.") (quotation marks and citations omitted).

For their part, defendants correctly note that knowledge of partisanship is not, on its own, enough to infer discriminatory causation. *See* Def. Mem. at 9 (citing *Gonzalez-de-Blasini*, 377 F.3d at 85-86).  And the only obvious evidence of Matos García's political animus is a single off-handed comment about the ousted PPD government's maintenance of a particular road. *See* Docket No. 71-3 at 5–7.  Because plaintiffs failed to show why a jury could find for Otero on this element, Matos García is entitled to summary judgment on Otero's claim.[10]

### B.      Pedroza's Claims

#### 1.      *Knowledge of Opposing Political Affiliation*

There is little evidence that any of the defendants knew Pedroza's PPD affiliation.  On the one hand, she testified that she was one of the "very few people in the municipality . . . who occupy electoral commissioner positions."  *See* Docket No. 82-1 at 131.  But it is undisputed that for a period of three years, including the 2008 election cycle and throughout the events narrated in the complaint, Pedroza was not active in the party. *See* Def. St. § 2, ¶¶ 2–4.  And other than drawing on generalizations about "a small town where everybody knows each other," Pl. Mem. at 11, plaintiffs fail to identify any record evidence that the individual defendants came to know Pedroza's PPD partisanship.  Lacking such evidence, plaintiffs fail to show how a jury could find this element to be satisfied, and defendants should be granted summary judgment on all of Pedroza's

---

[10] I base this conclusion on an analysis of plaintiffs' *prima facie* case, and thus do not separately consider the *Mount Healthy* defense.

claims.[11]   Nonetheless, I proceed to an alternative analysis of these claims assuming she can prove knowledge of her PPD affiliation.

### 2.       *Materially Adverse Action*

Pedroza's theory roughly covers three episodes:  (1) her treatment by Rivera in the Federal Programs department; (2) the attempt to transfer her to the Purchasing Department; and (3) her transfer to and treatment in the Finance Department.  As for the first of these, a jury could find that Rivera was responsible for hamstringing Pedroza's duties within Federal Programs.  There is evidence that Rivera limited Pedroza's work to "updating the books" through the end of the 2008–09 fiscal year, and gave Pedroza's other tasks to other employees; later, Pedroza was given additional, already-overdue assignments.  *See* Def. St. § 2, ¶¶ 26, 42, 48–50.  The jury might rationally conclude that this brought Pedroza's working conditions in Federal Programs below the norm for her post, satisfying this element for this claim.

On the other hand, Pedroza has not shown how her cancelled transfer to the Purchasing Department was materially adverse.  She contends that the move would have required her to perform non-accounting duties, and that she was not actually needed there.  But since it is uncontested that Pedroza never actually worked in Purchasing, it is not clear why anything about the duties she would have had, or whether she was even needed, are relevant.  What's left is the decision to (a) set up the transfer, and (b) to cancel it; yet plaintiffs never explain why either point is actionable.  *See also Martinez-Velez*, 506 F.3d at 42 (on wheat from chaff, quoted above).

Finally, as for her transfer to and treatment in the Finance Department, the evidence could support at least a minimally-sufficient finding that her conditions were rendered inferior to the norm.  Importantly, there is evidence that Pedroza had little work of her own upon being transferred; instead, she had to seek out excess work from

---

[11] This analysis makes it unnecessary to evaluate the validity or effect of defendants' argument that Rivera was not a PNP partisan.  *See* Def. Mem. at 16.

coworkers to keep busy.   Defendants miss the mark in arguing that Pedroza had no entitlement to work in a particular office, *see* Def. Mem. at 26–29; her complaint is that at the end of the day, she had less work than before the transfer.   *Cf. Rodríguez-García v. Miranda-Marín*, 610 F.3d 756, 766–67 (1st Cir. 2010) (plaintiff subjected to unreasonably inferior conditions where, among other things, she "spent most of her time doing nothing.").   Defendants counter that Matos Sánchez gave Pedroza "additional duties" and routinely approved Pedroza's requests to work on the tasks she managed to seek out.   Def. Mem. at 15–16.   But weighing conflicting evidence is the jury's domain, and Pedroza's showing regarding her transfer to Finance—from Ortiz's decision to transfer her to Matos Sánchez's management of her duties—would be enough to survive summary judgment.

In sum, the record permits a finding that Rivera, Ortiz, and Matos Sánchez each took part in subjecting Pedroza to materially adverse working conditions.   On the other hand, there is no evidence linking Figueroa or Ríos to any of the actionable episodes Pedroza complains of:   Figueroa was on maternity leave when Pedroza was transferred to Finance, and there is no other evidence of her involvement in either this transfer or in the alterations to her duties while in Federal Programs.   *See* Def. St. § 2, ¶¶ 56–57.   Ríos, meanwhile, was merely the head of the Purchasing office, and Pedroza has put on no evidence of any actionable conduct by him.   Accordingly, Figueroa and Ríos would be entitled to summary judgment on this element as well.

### 3.     *Causation and* **Mount Healthy** *Defense*

If, notwithstanding the discussion above, the court finds that the evidence supports a finding that Pedroza was known to be a PPD partisan, then the sum of the circumstantial evidence would permit a conclusion that Pedroza was both (1) treated poorly in Federal Programs and (2) ultimately transferred to Finance because of her political affiliation.   Most importantly, there is evidence that she was replaced in the Federal Programs office by less-qualified PNP partisans.   *See* Pl. St., ¶¶ 7–8, 10, 20.

Viewed in conjunction with , this could mean that she was moved to open up patronage spots, and also treated badly (both in Federal Programs and in Finance) in order to pressure her into resigning.   As for the transfer itself, Pedroza testified that Ortiz personally informed her of the decision.   *See* Def. St. § 2, ¶ 54.   There is therefore evidence that can establish Ortiz's personal involvement in this incident, and the mayor's position as a final employment-decision policymaker keeps the claim against the Municipality alive by extension.   *See Velázquez Rodríguez*, 659 F.3d at 181.

Defendants counter that Pedroza would have been treated the same way regardless of her affiliation.   Def. Mem. at 16–22.   For instance, there is evidence that Rivera and Pedroza perhaps had a mere personality clash.   *See* Def. St. § 2, ¶¶ 62–63, 66–68, and Pl. St., ¶ 21.   Similarly, the outside monitor's complaints about Pedroza's performance could have prompted the move to Finance, rather than her politics.   *See* Def. St. § 2, ¶ 53.   But regardless of whether this is analyzed as evidence undermining Pedroza's prima facie claims, or as evidence supporting a *Mount Healthy* defense, a plaintiff-friendly view of Pedroza's replacement in Federal Programs by PNP-loyal hires is enough to present a triable question of fact on the ultimate issue of political motive.

### 4.    *Summary*

Pedroza failed to go beyond speculation and bare rhetoric in establishing how any named defendant would have believed she was a PPD partisan.   There is also no evidence that Figueroa or Ríos were responsible for materially adverse conduct, since at most they were involved with the offered-but-withdrawn transfer to Purchasing, and there is no evidence of how that incident was materially adverse to Pedroza.   But were Pedroza able to prove that Rivera, Ortiz, or Matos Sánchez knew her affiliation, she would have enough evidence to reach a jury on the second and third elements of her claim. Nonetheless, all defendants are entitled to summary judgment on her political discrimination claims.

## IV.   Qualified Immunity

Defendants further contend that they are entitled to qualified immunity.  A state officer has a qualified immunity from suit unless both (1) a constitutional violation occurred, and (2) the officer unreasonably violated a clearly-established right. *Maldonado*, 568 F.3d at 268–69.  The second prong embeds two sub-elements: (a) whether the right was clearly established at the time of the officer's conduct, and (b) whether an objectively reasonable officer should have understood his conduct to violate that right.  *See id.*  But here, since both plaintiffs' claims fail on the merits, it is not necessary for the court to make separate findings on the qualified immunity defense.  *See Mead v. Independence Ass'n*, 684 F.3d 226, 236 & n.3 (1st Cir. 2012) ("In light of this conclusion, we have no reason to consider the [state] employees' qualified immunity defense.").

## V.   Supplemental Jurisdiction

Once all claims conferring original jurisdiction have been dismissed, a district court has discretion, assessing "the totality of the attendant circumstances," in retaining supplemental jurisdiction over other claims.  28 U.S.C. § 1367(c); *Rodríguez v. Doral Mortgage Corp.*, 57 F.3d 1168, 1177 (1st Cir. 1995).  Factors informing this exercise of discretion include judicial economy, convenience, fairness, and comity.  *Id.* (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988)).  Pretrial dismissal of federal-question claims usually counsels dismissal of state-law claims without prejudice, but these factors must be weighed in a "pragmatic and case-specific" way.  *Redondo Const. Corp. v. Izquierdo*, 662 F.3d 42, 49 (1st Cir. 2011).

Plaintiffs never explain how these factors weigh in their favor, and merely assert that "[t]his court has supplemental jurisdiction to hear and adjudicate" their tort claims. *See* Pl. Mem. at 23.  Particularly given the lack of a trial date in this case, *see* Docket No. 61, there is no judicial economy or convenience advantage in keeping this suit in federal court.   Moreover, all that remains, at best, would be Puerto-Rico-law claims against a

Puerto Rico municipality and its officers, which tends to make the comity factor weigh against retaining jurisdiction.   On balance, the court should decline supplemental jurisdiction and dismiss these claims without prejudice.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment should be **GRANTED.**

This report and recommendation is filed pursuant to 28 U.S.C. 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court.   Any objections to the same must be specific and must be filed with the Clerk of Court **within fourteen days** of its receipt.   Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review.   *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED.**

In San Juan, Puerto Rico, this 17th day of July, 2013.

*S/ Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge